This case on the dot is 2-15-1232. Susan Annan and Phillip Hall-Dodd are plaintiffs' children. They were able to acquire a gun and a munitions broker in 188 Park Avenue, LLC, defendant's affidavit, arguing on behalf of the defendants' families. Attorney Mr. Robert T. O'Donnell, arguing on behalf of the defendants' families. Attorney Mr. Jason A. Besson. Mr. O'Donnell. Thank you, Your Honor. Good morning, Your Honors. Good morning. In this case, it is our belief that the evidence showed, and the law supports, that the Village of Clarendon Hills inappropriately used the planned unit development process to achieve spot zoning. When you speak of process, you don't challenge in your brief the notice requirements or opportunity to be heard, correct? Do not. That's correct, Your Honor. So the procedures employed were proper. Your argument is the substance of what was done was in violation of their own ordinances. In violation of their own ordinances and in violation, considering the application of the LaSalle-St. Clair factors. But Your Honor is correct, we are not challenging the process. And you don't discuss in your briefs how many people testified at the hearings, et cetera? We don't, Your Honor, because candidly, in these sorts of challenges, at least I think the law supports, you challenge the decision itself. You don't challenge whether or not 45 people stood up in opposition or in support or in consideration of how, since the proper. We know at least two people were in opposition, the plaintiffs. We know at least two, the plaintiffs. But in terms of is it this many on one side and this many on another, we do not. And candidly, Your Honor, I don't think the law supports that being a relevant consideration. Might be if it were an administrative review process, but it's not. With respect to the LaSalle-St. Clair factors, you say in your briefs that we owe no deference to the trial court because the trial court didn't make specific findings. Do you have any case law that supports that notion? And Your Honor, I think that's more. You say it in your brief, but there's no authority for it, correct? There's no authority for it because typically, if not at least in my experience invariably, the trial court will go through each of the LaSalle factors in order to make a determination as to which side the court comes down on. And then at the end of that eight point analysis, a court will come to a conclusion. One is not required, and there is case law that supports this notion, that one is not a challenger, is not required to satisfy or prevail on each of the LaSalle factors. And some cases suggest that some of the factors are more important than others. For example, the first LaSalle factor. So is it your position the trial court here didn't deal with the LaSalle factors at all? The court clearly did because the opinion makes reference to the LaSalle factors. What the trial court didn't do is make any finding that gives any guidance as to how it came down on each of those LaSalle factors. Aren't we supposed to presume that based upon the nature of the judgment, which was in favor of the PUD, that any facts in contest relative to either the affirmative or the negative, that we are to presume that the trial court's findings were in the affirmative or supportive of the judgment? There's case law, I believe, to that effect, at least in the general arena. And I agree with that, Your Honor. Clearly the trial court reached a conclusion that – and the court mentioned the LaSalle factors. So in consideration of the LaSalle factors, the court concluded that it favored the village more than it did the objectors. Right. But the question I raise in our brief is why. In order to withstand scrutiny, I believe the court should have identified with respect to each of the LaSalle factors. For example, how is it that this particular use is consistent with surrounding zoning and land uses, that being the first LaSalle factor and some courts suggest the most significant? This court and, for that matter, the plaintiffs weren't given any guidance as to how the court reached that conclusion. Let's assume, as you say, for the sake of the argument, you have a legitimate point there. Isn't there a body of law that says we, on review, review the results to which the court arrived rather than its reasoning? Can we not affirm on any basis that we believe is legitimate? Absolutely, Your Honor. And so when we really get to the substance of it, whether the trial court had made specific findings on each of the LaSalle factors or not, we still are asking this court to take a look at the facts, to take a look at the application of the village ordinances and say, okay, our view, obviously, that this doesn't withstand scrutiny in consideration of the LaSalle factors. How does the standard of review tie into that? What is the standard of review? Don't we look at the trial court's determinations under the manifest weight of the evidence standard? You do. And that is defined as the judgment of the trial court would be upheld unless an opposite conclusion is clearly apparent. Correct? That's how you define manifest weight of the evidence. That's a fairly significant burden, isn't it? The burden in a LaSalle factors case is significant. It always has been. I suspect always will be. But I'm saying in this case, if one takes a look at the facts. This isn't what Justice Hudson is referring to. This isn't a review of the burden on review of LaSalle factors, except in the general or the generic sense that when the judge enters a judgment, we're supposed to look at the judgment and determine if the record either supports with the manifest weight, or I should maybe put it the other way, which is that the manifest weight of the evidence clearly concludes the opposite judgment should have been rendered. And that has nothing to do with LaSalle factors. It just has to do with what evidence is in the record, regardless of the type of cause of action. In other words, if it's a tort, it's an auto accident, the standard on review is whether or not it's against the manifest weight of the evidence. And the LaSalle factors have nothing to do with an auto accident. That's correct, Your Honor. But in this sort of case, the LaSalle factors are how the court got to reach its decision. So in determining whether. . . It's part of the record, yes. But Justice Hudson's point is well taken. And that is, is that we're supposed to be looking at what the evidence is and whether or not the evidence is so manifestly against the judgment. And so in the process of looking at the LaSalle factors, if the judge looks at these contested facts and says, I rule in favor of finding this factor weighs more heavily to one side other than the other, the only way we would reverse that individual finding as to his determination as to that factor is looking at the evidence and determining whether it clearly would suggest the opposite. And what I'm suggesting to the court is that it does. To follow up on that point, you concede in your brief and you discussed the evidence presented on each of the factors, correct? Yes. And so you concede that the village did offer evidence on each factor and the trial court ruled in the village's favor. I don't concede that the village offered evidence that's relevant to each factor. They offered evidence on the LaSalle factors, but. Okay. So you're quarreling with the trial court's determination that their evidence was relevant? Well, for example, let me answer it this way. When we talk about the land use that was approved on the subject property, both sides agree that whatever that use is going to be is under the village code a transitional use. And do you agree, following up on that point, maybe to get in a little more detail on your other issues, you agree that zoning is, generally speaking, exclusively within preference of the local control, local government, correct? Establishing the zoning code or the zoning law, if you will, is. But the application of it and the correct application of it isn't necessarily. They certainly make that determination. But here, when we're talking about whether or not the zoning code was correctly interpreted as a matter of law, that's done by, in the first instance, a court, and in the second instance, this court. What areas or factors did the city fail to present evidence on? I believe the city completely failed to demonstrate that this use on this property satisfied its own zoning code. I think they demonstrated that they approved a use. And if I can, Your Honor, with respect to this notion of a transitional use, critical to the outcome of the case, both sides agree it is a transitional use property. The village made an interpretation which the trial court accepted, that the zoning code requires only, and the key part of a transitional use is the setbacks applicable to the property, to transition from one, in this sense, single family, our one, to a business district. And in order to transition, the village code is very clear that there are setbacks applicable to a transitional use property which provide for that sensitive transition. The village interpreted and applied, and the trial court agreed, we submit clearly, erroneously, only provided one setback. On the residential side. On the residential side. That was 25 feet. 25 feet. Applied no setback on the corner side and front yards. Which related to what? To other businesses? Well, the front and the corner side yard would have been those that were across the street from the B1. But as we illustrate, I think it's on page 7 of our brief, we illustrated, literally illustrated, what the setback should have looked like, and then provided a graphic illustration to scale of what it looked like with the erroneous application of the transitional use ordinance. Well, so when the court asked me, did the village present evidence? Well, yes, they presented evidence, but in that instance, it's erroneous, and we look to their own village code where it's demonstrated to be erroneous. What kind of bird is a PUD? What kind of? Bird, rara abbas? A planned unit development is a mechanism that municipalities and county zoning codes provide for that gives flexibility. A PUD, a planned, a PUD is within a given zoning district. It's not its own zoning district, period, without exception. A PUD allows flexibility almost, again, almost invariably for a mix of uses that is not otherwise provided under the strict application of a zoning code. But what a PUD requires, and the Village of Clarendon Hill zoning code specifically requires as one of its standards, is that in order for the village to relax otherwise applicable provisions of the zoning code. Which they did in the ordinance that was finally passed, correct? Clearly. They did. They said in the ordinance that any other ordinance is contrary. I don't have it in front of me, but contrary to this. But, Your Honor. Essentially, correct? To that, what they did, they basically. They didn't. And it's very clear. What they did here is they used the PUD as a mechanism to affect a text amendment. They put a purely R4 use in a B1 district, called it a B1 PUD. If this were, it is purely an R4 use, if they had attempted to rezone the property to an R4, it would have required a variation from seven out of the eight area and site restrictions. Clearly inappropriate. Well, let me ask you, isn't a plan unit development used as a right in a B1 zoning district? It is allowed for. It's not a matter of right. It is allowed for if one satisfied the standards of a PUD. But a PUD is also allowed in an R4, in an R1, in eight of the village's zoning districts. As the village director of planning admitted that a PUD takes its character from the zoning district in which it is applied. Here, you have a B1 PUD without any vestige of a retail or business use. The very hallmark of the B1 district is avoided. The B1 district has listed, and this is atypical in municipal zoning codes, prohibited uses. Not only the allowed uses, but the prohibited uses. One of the prohibited uses is any residential on the ground floor. This has residential on the ground floor. It has parking guys on the ground floor. Correct? Which is residential. Yes. They call it a residential use. That's correct. It's a residential use on the first floor. There is no vestige of a retail or commercial use. So, Mike, the question is, I say rhetorically, how can we have a PUD in a B1 district with absolutely no B1 use? I've been involved with zoning matters since the 70s, I believe, on both sides of the fence, representing government, representing private individuals. And I do not recall an instance where a planned unit development did not amend the text, so to speak, of the zoning that it was involved in. In other words, there was something in that PUD that was different from the requirements, the parameters, the definition, the descriptions of the zoning ordinance that related to the property that was under that PUD. It's a hallmark of a PUD, Your Honor. You're absolutely correct. However, and typically it's a mix of uses, but that hallmark of a PUD, the counterweight to that being the hallmark of a PUD and consistent with the Village of Clarendon Hills Zone Code is there has to be tangible benefits to the municipality as a direct cause of whatever requirements are relaxed within the context of the PUD. Here, none. Just one. You didn't touch on this yet or haven't touched on it, probably because of our questions. Tell us what qualifier there is in the extension provision, the sunset provision. What temporal qualifier is there to support your argument that the PUD application became null and void? The Village Code is very clear. If you don't make the application for final approval of your PUD within one year period, it's null and void. And didn't the Village ordinance say that they granted the extension because of this litigation? But that ordinance was adopted four months after the expiration of the period, at which point, at least according to the Village Code, the PUD became null and void. Let me ask you a sort of important question. Was there anything in the Village Code, anything in state statutes that prohibits the Village from doing what they did here? I don't see any restrictions in the ordinances or the statutes that say they can't grant the extension under the circumstances under which they granted it. Do you have any case law that says they couldn't do that? The only case law that would apply and the only case law that we rely on that I know exists is that a municipality has to follow its own, a non-home rule municipality has to follow its own codes and ordinances. Here, the Village of Clarendon Hills, a non-home rule community, did not follow its own code and ordinance in allowing for a PUD that had been preliminary approved and therefore, according to their code, became null and void to four months later resurrect it. Well, what's the underlying rationale for the sunset provisions? Isn't it to make sure that you don't have the regulatory developer springing the Village along ad infinitum? Isn't that the basic reason you have the sunset provisions? One of them, certainly. So if the Village, why can't the Village in its wisdom decide that that wasn't the case or extenuating factors litigation, therefore, under the circumstances, they should extend it? But it would take, in the first instance, an application by the developer to request that extension. What it doesn't contemplate that the Village simply and magically grants an extension or allows an extension after the fact, it requires the developer to say, I would like an extension for whatever reason the developer seeks that extension. It didn't happen. So my point is that given what we believe should be the strict application of the Village codes and ordinances, that application wasn't made by the developer for whatever reason. The Village was involved in litigation over this development? Absolutely. So, and the Village took the position that qualified or, in their good graces, gave an extension after the fact? That's clearly what they did, Your Honor. Okay. How are you prejudiced by having this extension or this revitalization or this non-abrogation of the ongoing negotiations and process? Well, I mean, literally, if it had been applied strictly, this would have been over and the developer would have been presumably required to make a new application. Exactly. And they could have made a new application and could not the City have accepted like they did, I believe, with the traffic plan, accept virtually all of the prior pleadings, documentation, input, so on and so forth, and then have new hearings and then where are you? Well, the where are you question is interesting because the dynamic, and I'm not, you know, I'm getting beyond the record here, but I'm responding to the question. I would be curious because I believe in galactic metaphysical aspects of all these cases. No, and Your Honor, I agree, but keep in mind, by the time we had reached the point where, in our view, this should have been declared null and void, and let's say it's kicked back and the whole process has started over, the objectors, if you will, were considerably more, A, aware, B, prepared, C, at that point, represented, and so the process before the village may have resulted in a different and better result if all of the issues, some of which weren't vetted, could have been vetted. So I wouldn't presuppose that a do-over, if you will, would have resulted in what we have today. That's a good argument. Has something to it of appeal? Well, it presumes that things don't always follow the same result in a different timeline. They don't, and I think there's an example in the village. The court saw a reference in the record to the clock tower development, you know, which was an extreme example. What, pardon me? You said the clock tower development. No, that was in Clarendon Hills. Do they have a clock tower? Well, they don't. That would have been the development on the subject property had it not failed due to the recession. So my point is that that was not that many years ago, and different circumstances bring different results, and I think there was an example with respect to the subject property. That was my only point. Well, the village, one of the factors and one of the issues for the village was this land had sat vacant for a number of years, right? I didn't want to be flip, but the word that came to my mind is that's a ridiculous argument, and here's why it's a ridiculous argument. In nine years prior, the clock tower development was a mixed-use development, mixed-use being retail, first floor, residential, above, a clear amenity in the clock tower, and then it failed due to the recession. Well, the recession, if we're out of it, insofar as development is concerned, lasted for five to six of those nine years. Well, you can't always predict what's going to happen. And one other, finally, the fact that a business doesn't, a development doesn't work out or that traffic drops off or property values decrease, that does not necessarily mean that the ordinance originally approving it was unreasonable or arbitrary, does it? I'm not understanding. Are you saying that just because it doesn't work out doesn't mean it's unreasonable or arbitrary, does it? It doesn't. But it hasn't worked out for your clients, apparently. What hasn't, Your Honor? Well, this- Well, it hasn't gone forward, but what doesn't work is when- and there's some permanence. You allow an eight-unit condominium building in what's called a gateway corner of the village downtown business district. If it doesn't work, if it fails, it doesn't magically go away and something else is brought. And in all likelihood, that corner is given away, if you will, forever. So the opportunity for that gateway corner to be a gateway retail corner, which is what the comprehensive plan contemplates, that's gone. So the mutual support that the village code calls for, that retail requires of other retailers, that's gone. So it doesn't just fail and then we restart with something else. That typically would sit there for decades, literally. Okay. Your time is up. We'll have an opportunity to make rebuttals. Thank you, Your Honor. Mr. Giesinger? Geiser. Geiser, go ahead. Thank you. Do you know what that literally translates to? I don't. I know it's an Americanized spelling of a city in Germany, but I'm not sure what the origin of the name of the city is. Okay. Because Geis would usually be French, I think, but Geises. So it would have been G-E-I-S? That's correct. Okay. These are important preliminary matters. Yes, thank you. Well, I don't want to say I'm an entomologist, but I'm interested in names. O'Donnell means the son of Donald. Anything with O. Fitz means bastard son of. So Fitzgerald means you're the bastard son of Gerald. So the names have some significance. Convey historical fact and fantasy other than zoning matters. Go ahead. Historical fact, depending on your perspective. Good morning. Good morning. May it please the Court, my name is Jason Geisinger. I'm here on behalf of the builder Clareton Hills and the developer 88 Park Avenue, LLC. And before getting into the heart of the matter, at the outset, I would just like to emphasize exactly what it is we're talking about here. We're talking about a challenge to a building that complies with the zoning of the B-1 district in terms of height, in terms of bulk, in terms of density, completely. The only thing that doesn't comply with the B-1 is the fact that there's a parking unit, there's a parking garage on the first floor, as opposed to a retail component. What was the proposed price of these condominiums, $500,000 to $700,000? That's correct. Who could afford something like that? Well, the people of Clareton Hills can afford that, I believe, Your Honor. And Dale Kocinski, who is our valuation expert, reviewed the market for this type of condo, and there are no such opportunities for well-to-do empty nesters who are looking to downsize but still live downtown, close to transit, nice amenities, able to walk to the train, able to walk across the street to the coffee shop, the little shops that are in the downtown area. Who's Mr. Krakauer? Mr. Krakauer is the planning expert of the appellant's plaintiffs. He testified on pretty – he went over those self-factors in fairly specific detail, didn't he? He did. Was his testimony challenged then by the village? I mean, it was by your experts, right? It was. It was, certainly. Our expert, Mr. Poitner, disagreed on essentially every point that Mr. Krakauer raised with respect to the sale factors. And I would submit that that credibility determination was for the trial court to make. And the trial court found, at the very least, that on balance the plaintiffs did not prove by clear and convincing evidence that the legislation bore no relationship whatsoever to the public health, safety, and welfare. Counsel indicated he did not believe that the trial judge made any detailed findings or any real specific findings. Do you agree with that? I agree that he did not analyze each LaSalle factor and analyze the evidence with respect to each LaSalle factor. Nonetheless, he did – he does have a sentence. Judge Sheen, there's a sentence or a couple of sentences in his opinion where he indicates that he has reviewed the evidence that was submitted with respect to the LaSalle factors. He's analyzed that evidence and he has made determinations with respect to that evidence. And based upon that evidence, he found that the plaintiffs did not meet their burden in this particular case. And as Justice Hudson, as you pointed out, this court is to look at the conclusion of the trial court. And this court can rule based upon whatever evidence is in the particular record. What about the sunset provision? I mean, you know, there's an argument to be made that the village could do what it did. But what's the point of having a sunset provision if it could be ignored? Well, the point of the sunset provision, one of the primary points of the sunset provision is so that a developer moves diligently towards final PUD approval. In this particular case, there was a very good reason why the developer did not do that. The filing of this litigation changed things for the developer. It changed his calculation as to whether he wanted to move forward with the project. And I think it was perfectly reasonable for the village board in this particular case to find that that one-year requirement was told in this particular case or alternatively waive the requirement given the uncertainty caused by the litigation. We're not in a situation here that this development, that the developer didn't apply for final PUD approval within the one year because he was sitting on his hands. He was busy defending a lawsuit. And that's why there was a delay. So conceptually, then, the sunset provision, you seem to be saying, should operate as a shield for the village to defend against a dilatory developer and not be used as a sword for somebody challenging the developer. Absolutely. And with respect to the one-year requirement, I would also emphasize when I went over it in my brief that this is a purely, the one-year requirement is purely a creature of local ordinance. There's nothing in state law or federal law or in the state and federal constitutions that requires this particular sunset provision. Therefore, the village has the authority to modify its own ordinances through another ordinance. I take it you were unable to uncover any case law specifically on point as to whether or not the village can or can't do this under existing case law. Did you find anything in there? Well, the Hillside case, which isn't a great case because the facts are a little bit different in that case. What the village tried to do in that case was try to undo something that they previously did because they didn't follow their own rules. And that was kind of an interesting case. But I believe that case is still good law for the proposition that in the context of zoning, that a municipality can vary from and modify the requirements of its own zoning ordinance. And I think when you look at the Landmarks decision, which is talked about in the Gasoline Dealers Association decision, as well as the Chiricos, I believe is the case. In those cases, they talk very specifically about the authority. It's really a separation of powers issue. And it's the interplay between legislative authority and judicial authority. And what those cases all stand for is that a judiciary should not be in the business of undoing legislative enactments unless those legislative enactments in procedure or in substance violate state or federal law or violate the state or federal constitution. And there is nothing in the law, and there is nothing in the state or the federal laws that require this one-year requirement. The plaintiffs have argued that the challenge ordinances are arbitrary and unreasonable in light of the LaSalle factors. So can you tell us succinctly why they are not unreasonable in light of the factors? Sure. Just going through the particular factors, when you look at the first factors, zoning and existing uses of the nearby land, again, PUD developments are permitted uses in the B-1 district. Residential uses are allowed as a matter of right above the first floor in the B-1 district. As our planning expert testified, this particular building acts as a perfect transition between the denser B-1 and B-2 district and the less dense R-1 residential district. For clarity, when you say residential use, if this was a typical B-1 use, there would be a retail store or stores with inside the building footprint, correct? That's correct. And the residences would be inside but above the first floor? That's correct. And the parking for the residential uses would be on the first or the ground floor but not within the footprint of the building? No. The way that the illustrative downtown master plan envisions it is having a building on the property and then also having a parking lot on the property. And one of the things the downtown master plan identified, one of the problematic characteristics of this property was just that. It's very difficult to put a residential use on the first floor and appropriately accommodate the parking that is necessary there. You said residential. Did you mean retail? That is what I meant. I'm sorry. To have retail on the first floor and still accommodate the parking on the subject site, which is required because of the impact that would have on the nearby residential properties. What resident wants a parking lot abutting up to their property line? This particular building is set back 25 feet from the nearby single family residential uses. It has all the appropriate buffering. The parking is brought inside. There is not a retail component so you're not going to have the trash. You're not going to have the garbage. You're not going to have the noise and the odor that is associated with that. So the parking is actually enclosed? There are doors or gates or something like that?  Is there any residential parking outside the building? There is residential parking that's open to shoppers that are downtown. There is some street parking. You mentioned the provisions of the downtown master plan. That's discussed, the parking issues? It is. It's specifically identified that what the downtown master plan says is that a multi-use building is problematic for this particular site because of its topography and because of the issues with parking. That's also reflected in the 2013 update? The 2013 update clarifies what I believe the master plan has said all along. It clarifies that a single use building would be appropriate for this particular property as long as they were able to sensitively accommodate parking in transition from the nearby single family uses. Our planning expert, Mr. Poynter, testified extensively that this is precisely what this project accomplishes. So, succinctly, why should we uphold the judgment of the trial court? If you had to summarize in a few sentences, why should we do that? Because the village has complied completely with the LaSalle factors. The evidence in the record submitted by the village is, there is an abundance of that evidence in the record supporting each and every one of the LaSalle factors. Certainly, there was conflicting evidence that was submitted by their planning experts, but it's the purview of the trial court. It's the trial court's prerogative to make those determinations and make those particular factual findings. I will also say that this particular zoning, as has been stated, is a uniquely and fundamentally local legislative matter that should only be interfered with by the courts under very egregious and extreme circumstances. This particular project went through two public hearings, after which it obtained the unanimous consent of the plan commission. It went through a public meeting with the downtown, two public meetings with the downtown design review committee, which is comprised of architects who reviewed this and determined that this is consistent with and this is what the village wants in their downtown area. This is a purely legislative matter. It went through an extensive process, and we believe the trial court recognized that, and we believe the trial court should be affirmed because the planners simply just haven't met their burden that the trial court's findings were against the manifest way of the evidence. I don't know that I've seen it very often where counsel represents both the city and the petitioner of the POT. Do you do this often? We don't do it often, Your Honor, and I think why it's very uncommon is that cases in which a developer of the municipality are on the same side are very rare. In my experience, the cases are situations where a municipality is not granting a developer zoning relief that they are requesting, so the municipality and the developer are on opposite sides of the aisle. In this particular case, the interests of the municipality and the developer in terms of the zoning relief that is at issue are perfectly aligned, and in terms of just saving money and efficiency, it made sense in this case to handle it that way. But this is the first time in my career that I've done it. Any other questions? No. Okay. That is all I have. Thank you. Mr. O'Donnell. Thank you, Your Honor. Counsel, beginning his argument, made the statement that this particular use complies with everything required in the B-1 zoning district, with one exception, the use. I'm sorry? The use. It does not have a B-1 use. Zoning districts, first and foremost, are there to define the uses that will be permitted within that given district, and then from there, the zoning code identifies site and area restrictions for those particular uses. So to suggest that it complies with the B-1 zoning district without any vestige of a B-1 use, I think is a significant omission of this particular. Could you respond to counsel's argument that the sunset provision is not required by state law, that it's there as a shield for the village against villatory developers, and it should not be used as a sword against the village? Could you respond to that argument?  I think we should keep in mind that the plaintiff did not sue the developer. The plaintiff did not seek an injunction to prevent the developer from proceeding with his development. Now, granted, there was a lawsuit filed, and it certainly, if nothing else, provided a risk to the developer in proceeding, but for purposes of complying with the provision of the village code to seek application of final approval within a one-year period, there was nothing to prevent the developer from doing that, and no excuse for not doing so, or at the very least, making application within that one-year period to either stay, having to submit the application for final approval, or seek an extension of that deadline until the litigation is over. But to simply allow that deadline to pass, and under the village code, make that preliminary approval null and void, I don't think there's anything that gives the village the right to simply and magically say four or five months later, oops, we're going to resurrect the null and void preliminary approval, and now grant final approval, which is what they did. Have you ever heard of revestment? I have. Does it apply in this case? I don't think it does. Why not? The reason that it does is because the village code is clear and unequivocal as to the consequences of failing to apply or get an extension within the one-year period. It becomes null and void. And I don't think there's anything in the village code, and I think there would have to be something which allows for an exception. Well, there is. You make application for an extension. You ask for a stay. You do something within that one-year period in order to continue your right to proceed. The village makes the argument, and this was a lot of what their plan was testifying to. Well, this is a small challenged property. It's a corner property. It's got its challenges. There's nothing in the application of the LaSalle factors and there's nothing in the village code that allows the village under that circumstance to set aside the requirements of its own code and say, well, because this is a challenged property and we want to allow this development, we're just going to make it happen. But that, in point of fact, is what occurred. There's nothing that prohibits them from giving that fact consideration in a plan, is there? Yes. What is that? The fact that this is a state law that says that the village cannot take into consideration the unique features of a piece of property? They can always take into account the unique features, but what the village can't do is they can't violate their own ordinances, and here there is a specific village ordinance, and there is no dispute on this point that this is a transitional-use property. The village was required to apply, strictly apply, the transitional-use requirements, which would have reduced the size of the building. Even if, we assume for the sake of discussion, that it would have no vestige, it would be eight condominium units or five condominium units, no B1. Use aside, they were required by both their own ordinance and by the applicable state law because they can't deviate from their ordinances as a non-home-rule municipality. They had to apply that transitional-use requirement, and they completely failed. And that failure isn't academic. That failure has a direct adverse impact on adjacent properties. So, based on your understanding of what should have happened, how many condominiums and what should the footprint have been? Under the... In other words, assuming that you're correct, what should have gone in there? Well, I would look in the first instance to the village's own comprehensive plan. You said this was bigger than permitted. Yes. In order for you to say that, you have to have a benchmark. Yes. What's the benchmark that you're referring to? The benchmark is on page 7 of our brief. If it had been applied correctly, it would have allowed for, consistent with Mr. Krakauer's testimony, a building with a footprint of 4,800 square feet, not 10,000 square feet, built lot line to lot line. That 4,800 square foot calculation by Mr. Krakauer is consistent with the comprehensive plan, which shows a 4,000 square foot footprint for a building on the subject property. So, both the comprehensive plan, the application of the transitional use ordinance requirement, and consistent with the expert testimony, we would have been looking at a building with a footprint of 4,000 to 4,800 square feet, not more than twice that. I guess that's it. Are there any other questions? Thank you, sir. We'll take a short recess. There are other cases on the call.